IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| **Immunology Partners Inc.** | Case No. 12-13259 (BLS) |
| Debtor. | Re: Docket. Nos. 112, 178 |

Karen B. Skomorucha Owens, Esquire
Ashby & Geddes, P.A.
500 Delaware Avenue, 8th Floor
Wilmington, DE  19899

Guy Brenner, Esquire
Proskauer Rose LLP
1001 Pennsylvania Avenue, NW
Suite 400 South
Washington, DC  20004-2533

Robert L. Eisenbach, III, Esquire
Cooley LLP
101 California Street, 5th Floor
San Francisco, CA  94111-5800

*Counsel for Debtors*

Thomas G. Macauley, Esquire
Macauley LLC
300 Delaware Avenue, Suite 760
Wilmington, DE  19801

Andrew D. Freeman, Esquire
Brown, Goldstein & Levy, LLP
120 E. Baltimore Street, Suite 1700
Baltimore, MD  21202

*Counsel for Norman Paradis, M.D.*

## **OPINION**[1]

Before the Court is Dr. Norman Paradis's ("Dr. Paradis") Motion to Enforce Agreement to Settle Claims ("Motion") [Docket No. 112], seeking the Court's enforcement of an alleged settlement agreement between Dr. Paradis and the Debtor, Immunology Partners Inc.

---

[1] This Opinion constitutes the Court's findings of fact and conclusions of law pursuant to Fed. R. Bankr. P. 7052.

("Immunology").[2] Immunology has filed an objection [Docket No. 178] to Dr. Paradis's Motion arguing that the parties' Memorandum of Understanding (the "MOU")[3] was never finalized and thus never became a binding and enforceable agreement between the parties. For the reasons stated below, the Court finds that under Maryland law, the parties did not intend to be bound by the MOU and never completed the process of entering into a binding, enforceable contract. Therefore, Dr. Paradis's Motion will be denied.

## I. BACKGROUND

On November 26, 2007, Immunology, a biotechnology company based in Columbia, Maryland, hired Dr. Paradis to serve as Vice President of Clinical Affairs and Chief Medical Officer. The record reflects that the parties' relationship quickly soured. Immunology says it attempted to negotiate a separation agreement with Dr. Paradis, to no avail.[4] So, on August 20, 2008, Immunology fired him.

Following his termination, Dr. Paradis prepared a lawsuit against Immunology for, among other claims, fraudulent recruitment and wrongful termination. Instead of litigating, the parties agreed to attempt first to mediate their dispute. Immunology contends that it insisted that the mediation address all of Dr. Paradis's potential claims; it did not want to negotiate piecemeal.

The first mediation session occurred on January 16, 2011. It was unsuccessful. The main sticking point was whether Dr. Paradis had commenced a False Claims Act action ("FCA Action") against Immunology and the consequences of such an action if filed. Immunology's concerns regarding a potential FCA Action stemmed from allegations Dr. Paradis had raised regarding possible off-label

---

[2] When Immunology hired Dr. Paradis, it was known as Cylex Inc. On February 8, 2013, Cylex's assets were sold, and its name was changed to Immunology Partners [Docket No. 156].

[3] A copy of the MOU has been filed as Exhibit A to Dr. Paradis's Motion and appears at Docket No. 112.

[4] Declaration of Brad Stewart in Support of Debtor's Objection to Norman Paradis's Motion to Enforce Agreement to Settle Claims, February 12, 2013, at 2-3 ("Stewart Decl.") [Docket No. 148].

marketing by Immunology. If Dr. Paradis filed an FCA Action, Immunology wanted to obtain the broadest release permissible under law. But, constrained by applicable law that mandates confidentiality regarding pending matters under the False Claims Act, Dr. Paradis never disclosed whether he had filed an FCA Action. *Id.* As discussed in detail below, Dr. Paradis had in fact filed an FCA Action on September 21, 2010, well before the beginning of the mediation process.

On June 16, 2011, the parties met for a second try at mediation. This session lasted twelve hours and was largely successful. The parties spent most of the time negotiating a financial settlement, with Immunology agreeing to pay Dr. Paradis $625,000 to obtain a general release of all of his claims.

The parties signed the MOU reflecting the terms of the parties' agreement. Notably, the MOU contained language that the parties "agree to execute a Settlement Agreement and General Release to effectuate such agreement."[5] The record reflects that, notwithstanding consensus on the amount of the claim, certain matters remained open for further discussion and negotiation. Specifically, Section 5 of the MOU, entitled "Potential *Qui Tam* Actions," consisted of just three words: "To be negotiated."

The parties negotiated for three months after signing the MOU, attempting to resolve issues surrounding potential *qui tam* actions. The parties exchanged at least five written proposals and counters. Additionally, the parties entered into a series of written tolling agreements, extending the statute of limitations so they could continue settlement discussions. The parties never resolved the *qui tam* issue, notwithstanding continuing discussions until September 7, 2011.[6] After that, communications ceased between the parties until the Debtor commenced this bankruptcy proceeding.

---

[5] Motion to Enforce Agreement Ex. A, at 1 (the MOU) [Docket No. 112].
[6] Declaration of Connie Bertram in Support of Debtor's Objection to Norman Paradis's Motion to Enforce Agreement to Settle Claims, February 12, 2013, at 3 ("Bertram Decl.") [Docket No. 149].

Clearly, the prospect of an FCA Action was a major sticking point in the parties' settlement dialogue.  Immunology suspected that Dr. Paradis had commenced such an action, but federal law prevented Dr. Paradis from confirming that suspicion or even discussing it with Immunology.  On January 2, 2013, however, the United States District Court for the District of Massachusetts unsealed *United States of America, et al. ex rel. Dr. Norman Paradis v. Cylex, Inc.*, revealing that Dr. Paradis had indeed filed a False Claims Act[7] ("FCA") claim against Immunology in September of 2010.[8]

Under the FCA, once a claim is made, the United States government must investigate the claim.[9]  The government investigates the claim by issuing "civil investigative demands" on "any person [the government believes] may be in possession, custody, or control of any documentary material or information relevant to a false claims law investigation."[10]

After investigating, the government must decide whether to intervene in the matter.[11]  As a general proposition, if the government declines to intervene, then a private individual, as a relator, may bring a variety of claims against federal contractors.[12]  A private individual's action is called a *qui tam* action.  If the relator recovers anything in his *qui tam* action, the recovery is split, with the relator keeping up to 30 percent and the government receiving the rest.[13]  A relator cannot agree to settle a *qui tam* claim, and subsequently dismiss the *qui tam* action, without the government's consent.[14]

Immunology alleges that on July 15, 2011, it received demands for documents and production of records from the government that

---

[7] 31 U.S.C. §§ 3729-3733.
[8] Stewart Decl. at 7.
[9] 31 U.S.C. § 3730(a).
[10] *Id.* § 3733(a)(1).
[11] *Id.* § 3730(b)(2), (b)(4).
[12] *See id.* § 3730(b)(1).
[13] *Id.* § 3730(d)(2).
[14] *See id.* § 3730(b)(1).

4

mirrored Dr. Paradis's allegations.[15] Immunology complied with the government's demands, incurring hundreds of thousands of dollars in costs and attorneys' fees in the process. The record reflects that, after an exhaustive investigation, the government filed its Notice of Election to Decline Intervention on December 21, 2012. *Id.* at 7-8. Nonetheless, the record reflects that the cost of complying with the investigation was a main reason Immunology filed for bankruptcy protection. *Id.* at 8. And, because the government has declined to intervene in the matter, Dr. Paradis can still bring his FCA claim as a relator. The record indicates Dr. Paradis's *qui tam* action is still pending. *Id.*

On December 3, 2012, Immunology voluntarily filed a Chapter 11 bankruptcy petition. On January 18, 2013, Dr. Paradis moved to enforce the parties' agreement to settle claims against each other. The effect of enforcing the agreement described in the MOU would be to give Dr. Paradis an allowed unsecured claim in the amount of $625,000. On February 12, 2013, Immunology objected. The Court heard argument on the Motion on February 25, 2013.

## II. JURISDICTION

The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334, and venue is proper in this Court and in this District pursuant to 28 U.S.C. §§ 1408 and 1409. This is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (B), and (O).

## III. DISCUSSION

Dr. Paradis argues the MOU is a finalized contract with definite terms, and that the parties intended to be bound by it. In support of his construction of the MOU, Dr. Paradis urges the Court to focus on the opening recitals of the MOU which he contends reflect the parties' agreement and commitment:

> This Memorandum of Understanding (hereinafter "MOU") is made and entered into by Norman Paradis ("Paradis") and Cylex, Inc. ("Cylex") and Insperity (collectively, the "Parties") this 8th day of June, 2011.

---

[15] Stewart Decl. at 7.

> WHEREAS, the Parties have reached an agreement to settle all disputes Paradis has against Cylex and/or Insperity and all disputes Cylex has against Paradis;
>
> WHEREAS, the Parties agree to execute a Settlement Agreement and General Release to effectuate such agreement;
>
> WHEREAS, the Parties agree that such Settlement Agreement and General Release will contain the following terms, which will be described in language agreeable to all Parties: …[16]

Immunology argues that there was no manifestation of mutual intent because the parties left material terms open to negotiation and continued negotiating months after signing the MOU.  Further, the MOU speaks in future terms of executing "a Settlement Agreement and General Release," expressly contemplating that there would be a further step in documenting and finalizing their agreement.  Immunology thus argues the MOU is an unenforceable "agreement to agree."  At bottom, the issue before the Court is whether (i) the unresolved issue contained in Section 5 of the MOU and (ii) the failure to take the additional steps described in the MOU preclude a finding that the parties entered into a complete, enforceable agreement by way of the MOU.

The parties have stipulated that Maryland law governs the MOU.  The Maryland Court of Appeals has held, as a baseline proposition, that an enforceable contract requires a "manifestation of mutual assent."  *Cochran v. Norkunas*, 919 A.2d 700, 708 (Md. 2007).  Mutual assent requires two elements:  (1) the intent to be bound; and (2) definiteness of terms.  *Id.* at 708.  Failure to agree on an essential term of a contract may indicate mutual assent is lacking.  *Id.*  If the parties do not intend to be bound until a final agreement is executed, there is no contract.  *Id.*

---

[16] MOU at 1.

In *Cochran v. Norkunas*, potential real estate buyers sent the seller a letter of intent and a deposit check for the seller's property. *Id.* at 704. The Letter of Intent read as follows:

> Buyers offer to buy 835 McHenry Street… . A standard form Maryland Realtors contract **will be delivered** to seller within 48 hours. Seller to pay only ½ normal transfer taxes and a 3% commission to Long & Foster. All other costs of closing to be paid by buyers.
>
> The contract **will contain** a financing requirement for buyers, but buyers will guarantee closing and not invoke the financing contingency. We **will delete** the standard home inspection contingency.

*Id.* at 703 (emphasis added).

The Maryland Court of Appeals held that the Letter of Intent did not bind the parties because, *inter alia*, its language was "indicative of an intent to memorialize the property sale through a final standard form contract." *Id.* at 712. Thus, the parties in *Cochran* contemplated finalizing the contract in the future, in a different document. The court found that the Letter of Intent did not support a finding that the parties intended to be immediately bound by its terms.

Immunology argues that the MOU is a type of "preliminary agreement" that is not enforceable because it is not complete. In *Cochran*, the Maryland Supreme Court discussed four types of preliminary agreements: (1) a fully binding preliminary agreement where the parties have reached complete agreement (including agreement to be bound) on all issues perceived to require negotiation; (2) a binding preliminary commitment; (3) an agreement with open terms; and (4) an agreement to agree. *Cochran*, 919 A.2d at 707-08 & n.5; s*ee also Teachers Ins. and Annuity Ass'n v. Tribune Co.*, 670 F. Supp. 491, 498-503 (S.D.N.Y. 1987). A fully binding preliminary agreement is considered a binding contract; a binding preliminary commitment is considered a binding contract if the evidence shows that the parties intended to be bound by it. The open-term agreement and the agreement to agree are not considered binding contracts. *Id.*

Maryland courts analyze five principal factors to determine a party's intent to be bound to a contract:  (1) language of the preliminary agreement; (2) the existence of open terms; (3) whether partial performance has occurred; (4) the context of the negotiations; and (5) the custom of such transactions.  *Cochran*, 919 A.2d at 708-09.  If application of these factors favors Dr. Paradis, then the MOU is enforceable. If they favor Immunology, then the MOU is not enforceable. The Court addresses each of these factors in turn.

Language of the Preliminary Agreement

In this case, the parties sat down at the conclusion of the second mediation session and memorialized their discussions in the MOU. The MOU clearly indicates that *qui tam* issues remained outstanding and still had to be resolved.  Section 5 of the MOU, entitled "Potential *qui tam* issues," had three words in it:  "To be Negotiated."  Further, as noted above, the opening recitals of the MOU clearly reflect an intention to subsequently memorialize the agreement in a later document.  This contingent language echoes the letter of intent considered by the Court in *Cochran*.

Dr. Paradis argues that the MOU's language indicated a final, binding contract.  The MOU recited that the parties agreed to settle all claims and finalize the agreement by a formal, written document.  Dr. Paradis cites *Lopez v. XTEL Constr. Grp., LLC,* 795 F. Supp. 2d 693 (D. Md. 2011*)* in support of the proposition that *Cochran* has been applied to find that agreements that manifest the parties' intent to enter into an agreement are enforceable contracts, even if they expressly contemplate an additional, formal 'settlement agreement' that is never completed and even if there were additional open, non-material terms.

*Lopez* is distinguishable.  In *Lopez*, the parties agreed that they settled, and litigation arose only after a defendant tried to withdraw his consent to the settlement.  *Id*. at 698.  Here, Immunology has never admitted that the parties settled, and stresses the recital in the MOU that the parties would memorialize their agreement in a later document.  As discussed, if the parties do not intend to be bound until

a final agreement is executed, there is no contract. *See Cochran*, 919 A.2d at 708. It is clear from the record that the parties considered the *qui tam* issue important and that it still needed to be resolved after signing the MOU.

  Existence of Open Terms

The parties dispute the existence of open terms. Dr. Paradis argues the MOU "settles all of the parties' disputes" and thus any discussions after signing the document are immaterial. Immunology argues that resolution of the *qui tam* issue was vital to any agreement to settle Dr. Paradis's claims.

At oral argument, Dr. Paradis argued that there was nothing he could do after filing the FCA Action because it was in the government's hands. Thus, the MOU reflected his position that nothing could be done about potential FCA litigation (given the government's control over such claims), and Section 5's open terms were thus immaterial. The record developed at trial, and the parties' briefs and attachments, show, however, that the open terms were material. The parties negotiated for several months after signing the MOU, sending proposals and responses to each other.[17] Additionally, the parties considered the government's involvement in negotiating the *qui tam* language but were unable to come to terms.[18]

  Partial Performance

Neither party has performed any act required under the MOU. Immunology has not paid Dr. Paradis $625,000 and Dr. Paradis has not returned Immunology's property, as he was required to do within 10 days of signing the MOU.[19] Essentially, the parties remain in the same position they were in when they signed the MOU.

---

[17] *Id.* ("Failure of parties to agree on an essential term of a contract may indicate that the mutual assent required to make a contract is lacking.").

[18] Several drafts contained "what if" provisions regarding the government's potential involvement. *See* Bertram Decl. Exs. D, E, H, M, T.

[19] At argument, Paradis's counsel explained that Dr. Paradis delivered the materials to his lawyer. While understandable, this is not what the MOU required or contemplated. *See* MOU at ¶ 11 ("Paradis agrees that no later than 10

9

Context of the Negotiations

As stated above, the parties negotiated for three months after signing the MOU, trying to hammer out language regarding Dr. Paradis's *qui tam* claim. This weighs strongly against any finding that the MOU is an enforceable agreement. *Accord, Paramount Brokers, Inc. v. Digital River, Inc.*, 126 F. Supp. 2d 939, 946-48 (D. Md. 2000) (holding that letter of intent was not binding because, *inter alia*, the parties continued negotiating after signing the letter of intent).

The record reflects that Immunology and Dr. Paradis negotiated for months after signing the MOU, sending proposals back and forth about the *qui tam* language.[20] As stated above, Immunology wanted to settle all of Dr. Paradis's claims in one settlement, and the parties had to navigate the tricky *qui tam* issue. The continuous revision and negotiation of the MOU indicates how important the *qui tam* issue was to Immunology and speaks to the parties' intention not to be bound until a final written agreement. *See Phoenix Mut. Life Ins. Co. v. Shady Grove Plaza Ltd.*, 734 F. Supp. 1181, 1189 (D. Md. 1990) (citing *Knight v. Sharif*, 875 F.2d 516, 524 (5th Cir. 1989)) ("Indeed, continual redrafting of a document indicates the importance of the terms being negotiated and the parties' intention not to be bound until final execution of the written agreement.").

Custom of Such Transactions

The facts here indicate that the parties intended to finalize their settlement in another document. *See Cochran*, 919 A.2d at 712 (parties contemplated using the Maryland Real Estate Form, not the letter of intent, as their final contract); *see also Paramount*, 126 F. Supp. 2d at 948 ("Finally, the custom of a transaction of this sort indicates . . . [t]he

---

days after the date he executes this Agreement he and his counsel will return to Cylex all property, documents and data belonging to Cylex."). *See also* Stewart Decl. at 3.

[20] Stewart Decl. at 5-6. *See also* Declaration of Maureen Knight in Support of Debtor's Objection to Norman Paradis's Motion to Enforce Agreement to Settle Claims, February 12, 2013, Ex. A (highlighting changes that Dr. Paradis's then-counsel made to the MOU's *qui tam* provision) [Docket No. 150].

broker agreement contemplated by the parties in this case is the type of final contract which parties would normally reduce to writing before they would bind themselves legally."). This Court has long experience with the stages of settlement of complicated legal disputes. Matters are conditionally settled in this Court on a daily basis, with such settlement typically being "subject to final documentation." Just so here: the parties made great progress at the mediation table, and wisely memorialized what they had all agreed upon. But the process was not completed, and the record reflects that final agreement on all material points was never achieved. Courts must be chary of enforcing settlements absent meaningful evidence of consensus and commitment by both sides: there are often multiple steps to settlement of a significant dispute, and as a general proposition "all of the pieces must come together" before it is rational for both sides to settle. Requiring, as Maryland law does, that the parties demonstrate that negotiations have concluded as to all material open terms is simply wise practice and ensures that litigants will not be saddled with the burden of performing under a partial or incomplete settlement. Under Maryland law, if the parties do not intend to be bound until a final document is signed, then the intervening versions are not binding. *Cochran*, 919 A.2d at 711. Here, the parties' conduct after signing the MOU (continuing to try to document a deal, and entering into tolling agreements to keep the settlement process alive) highlights its contingent and incomplete nature.

## IV. CONCLUSION

For all of these reasons, Dr. Paradis's Motion is denied. An appropriate Order follows.

**BY THE COURT**:

Dated: Wilmington, Delaware
      April 3, 2013

Brendan Linehan Shannon
United States Bankruptcy Judge